FILED
CLERK
3:36 pm, Feb 22, 2019
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
KYLE VETRANO,

                Plaintiff,

     -against-

MILLER PLACE UNION FREE SCHOOL
DISTRICT, MILLER PLACE HIGH SCHOOL,
CHRISTINE MANGIAMELE, and
MARIANNE HIGUERA,

                Defendants.
---------------------------------------------------------X

**MEMORANDUM OF DECISION & ORDER**
2:16-cv-03329 (ADS)(AYS)

**<u>APPEARANCES:</u>**

**Ray, Mitev & Associates**
*Attorneys for the Plaintiff*
122 North Country Road
P.O. Box 5440
Miller Place, NY 11764
      By:    John W. Ray, Esq., Of Counsel.

**Sokoloff Stern LLP**
*Attorneys for the Defendants*
179 Westbury Avenue
Carle Place, NY 11514
      By:    Steven C. Stern, Esq.,
                Chelsea Ella Weisbord, Esq.,
                Mark A. Radi, Esq., Of Counsel.

**SPATT, District Judge**:

       The plaintiff Kyle Vetrano (the "Plaintiff") brought this action under the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983") against the defendants Miller Place Free School District (the "District"), Miller Place High School (the "High School"), Christine Mangiamele ("Mangiamele"), and Marianne Higuera ("Higuera") (collectively, the "Defendants") alleging violations of his constitutional rights to free speech, freedom of association, and due process.

Presently before the Court is a motion by the Defendants, pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P." or "Rule") 56, seeking summary judgment dismissing the complaint. For the reasons that follow, the Court grants the Defendants' motion in its entirety.

## I. BACKGROUND

Unless otherwise noted, the following facts are not in dispute. The Court draws these facts from the Defendants' Rule 56.1 Statement of Material Facts and the Plaintiff's Response. ECF 25 (the "SMF"). As a preliminary matter, the Court notes that the Plaintiff issued a number of conclusory, non-responsive objections without putting forward specific evidence contradicting the Defendants' proposed statements of fact. The Court treats these facts as admitted to the extent they are supported by the record, because the Plaintiff's cursory rebuttals contravene the procedure articulated in the local rules. *See* Local Rule 56.1(c); *Bank of Am., N.A. v. Fischer*, 927 F. Supp. 2d 15, 19 (E.D.N.Y. 2013); *Hartley v. Rubio*, 785 F. Supp. 2d 165, 171 n.1 (S.D.N.Y. 2011).

The District is a school district located in Suffolk County. The High School is one of the schools in the District. Higuera is the District's Superintendent of Schools, and Mangiamele is an Assistant Principal at the High School. The Plaintiff was a student at the High School. This action relates to discipline the Plaintiff received for conduct during an extracurricular activity in his senior year at the High School. Specifically, the Defendants prohibited the Plaintiff from participating in the second night of an annual variety show for a comment he made during the show's opening night.

**A. THE VARIETY SHOW**

Each year the High School holds a variety show (the "Variety Show") which consists of musical and other talent acts (the "Acts"), separated by satirical skits performed by members of the senior class (the "Skits"). Students performing Acts during the Variety Show compete for a

prize. Faculty members, who act as judges, select the winner. Unlike the Acts, the Skits are ineligible to win prizes, and are intended to occupy the time between the Acts. The Skits often poke fun at faculty, school policies, and other school-related issues.

The Variety show is a school-sponsored event. There is a general understanding that what is performed in the Variety Show has been approved by the High School and by Mangiamele, who is credited as the Variety Show's Producer/Director. The talent for Acts each audition before the student-run Executive Council and the Variety Show faculty advisor (the "Faculty Advisor"). The Executive Council decides which Acts will be in the show, and the Faculty Advisor screens and approves the song lyrics. Rather than an audition process, the Skits are submitted for approval to the Executive Council, which passes them on to the Faculty Advisor for approval.

After the Faculty Advisor approves the Skit scripts, he or she submits them for approval to any faculty member who is mentioned by name or likeness. If a faculty member is mentioned, he or she must approve the script in order for the students to be permitted to perform it in the Variety Show. If a staff member does not approve the script, that person may not be mentioned in the Variety Show.

**B. THE CODE OF CONDUCT**

The Faculty Advisor follows the procedure for approving Skits in accordance with the Code of Conduct's expectations for acceptable conduct, and the anti-bullying and harassment policy. The Code of Conduct articulates that all students, school staff, parents, and other visitors must meet the High School's expectations for acceptable conduct while on school property and at school functions. A "school function" is any school-sponsored event or activity held on or off school district property.

3

In accordance with the Code of Conduct's expectations for acceptable conduct, students must: (a) conduct themselves as representatives of the district; (b) conduct themselves in an appropriate and civil manner with proper regard for the rights and welfare of others; (c) show respect to others; (d) hold themselves to the highest standards of conduct, demeanor, and sportsmanship; and (e) accept responsibility for their actions.

The Code of Conduct also prohibits conduct that is insubordinate, disruptive, or endangers the morals of others. Insubordinate conduct includes failing to comply with the reasonable directions of teachers, school administrators or other school employees in charge of students, or otherwise demonstrating disrespect. "Disruptive conduct" includes failing to comply with the reasonable directions of teachers, school administrators or other school employees in charge of students. Conduct that endangers the morals of others includes harassment, bullying, or discrimination against any student.

Students must familiarize themselves with and abide by all district policies, rules, and regulations dealing with student conduct. Failure to comply with the Code of Conduct may result in certain disciplinary penalties. An Assistant Principal or Activity Director is authorized to remove a student from a school function when the student violates the Code, so long as it is consistent with the student's right to due process. The amount of due process to which a student is entitled before receiving a penalty depends on the penalty imposed.

Regarding extracurricular activities, the Code of Conduct specifies that participation in extra-curricular activities is a privilege earned by students who are in good academic standing and demonstrate good citizenship. As a result, the Code of Conduct does not provide a hearing for students removed from an extra-curricular activity pursuant to Education Law § 3214. Instead, the Code provides the student and the student's parent a reasonable opportunity for an informal

conference with the district official imposing the suspension to discuss the conduct and the penalty involved.

C. THE FACTUAL BACKGROUND

Students submitting Skits in 2015 sent them to then-Executive Council President Robby Revera ("Revera"), who submitted them to Mangiamele for approval. Mangiamele ensured that each of the faculty members represented in a Skit was given the script to review and approve. One Skit (the "Bathroom Skit") satirized the High School's enactment of a policy which limited use of the bathroom to one student at a time, supposedly to combat the smoking in the bathroom.

On March 20, 2015, Robby Revera emailed Mangiamele a draft of Plaintiff's Bathroom Skit script, which Mangiamele approved. When the Plaintiff submitted his script to Revera, he told the Plaintiff that he had to give the script to Mangiamele for her to approve.

On March 23, 2015, the Plaintiff emailed Revera a modified script for the Bathroom Skit with new lines, which Mangiamele approved. That same day, the Plaintiff attended a rehearsal for the Variety Show in the High School's auditorium. At the beginning of the rehearsal, Mangiamele addressed the students as a group and advised them that they must stick to the script and not improvise lines. Mangiamele also advised the students that they must make good decisions, and that any student who did not do so would be pulled from the show, potentially affecting upcoming events. Mangiamele also reminded the students that faculty members signed off on the Skits, and that there were to be no changes to the approved Skits.

On March 26, 2015, the High School hosted the first night of the Variety Show. Before the show, Mangiamele sat the students in the gymnasium, and reminded them that they may not deviate from the approved script. She advised the students to be on their best behavior and not to

5

try anything that will get them in trouble and warned them that if they did not follow the rules, they can have other events taken away.

During the Bathroom Skit, the first Skit of the show, the Plaintiff improvised the following line omitted from the drafts of the script approved by Mangiamele – "Is this why our Superintendent makes so much money, to ·write bathroom policy?" Immediately after the Skit, Mangiamele spoke with the Plaintiff regarding his failure to stick to the script. She told him they would discuss it the following morning, but that his actions may affect the second night of the Variety Show. The Plaintiff agreed that the line in question was not part of the script but disagreed that his actions violated the rules. The Plaintiff stayed for the remainder of the show and performed in two other Skits as planned.

On March 27, 2015, the day of the second Variety Show, Mangiamele spoke with the Plaintiff during the first period. She told him that he would not be able to attend the second night of the Variety Show because he failed to stick to the approved script and did not follow the rules. Mangiamele told the Plaintiff that, if he wanted, he could appeal the decision to Higuera.

After meeting with the Plaintiff, Mangiamele called the Plaintiff's mother. Mangiamele told the Plaintiff's mother that he said something in a Skit that had not been in the approved script, and that as a result he would not be allowed to participate in the second night of the Variety Show. Specifically, Mangiamele explained that the Plaintiff referenced the Superintended without getting her approval beforehand. Mangiamele advised the Plaintiff that each individual mentioned in a Skit must approve before they can be referenced in the Variety Show.

Later that day, Higuera met with the Plaintiff for about 15 minutes. They discussed what happened at the Variety Show and the High School administration's decision not to allow him to participate or attend that night's performance of the Variety Show. The Plaintiff apologized and

told Higuera that the line was improvised and that it was meant to be lighthearted and part of the satire. Higuera told the Plaintiff that he had broken a rule and that as a consequence he could not attend the second night of the Variety Show. Higuera explained that participating in the Variety Show is a privilege, not a right. The Plaintiff expressed to her his disagreement with her decision. As the Plaintiff left her office, he said: "I m[a]y have lost one night, but you're going to lose the popularity of your district."

After leaving Higuera's office, the Plaintiff spoke to his mother on the phone. The Plaintiff told his mother that he broke a rule and was not allowed to attend the Variety Show. The Plaintiff's mother then spoke to Higuera about the decision not to allow the Plaintiff to attend that night's show. Higuera informed the Plaintiff's mother that the Plaintiff had broken a rule, and that there are consequences for breaking the rules.

These events culminated in the Plaintiff ultimately being prohibited from attending the second night of the Variety Show. The Plaintiff received no other discipline.

The Plaintiff publicized his discipline on multiple platforms. On March 27, 2015, the Plaintiff posted a document entitled "An Open Letter" on Twitter which detailed his version of events. The Plaintiff also organized a rally to "garner attention and bring attention" to what happened. At the rally, students wore t-shirts that said "Free Kyle 1st Amendment" with a picture of his face imprinted. The Plaintiff circulated a petition requesting an apology from the Superintendent, communicated with several news media outlets, and issued a press release. On April 2, 2015, the Plaintiff held a press conference with his attorney in front of the District's Administration building.

On May 27, 2016, the Plaintiff brought an action based on these facts in the Supreme Court of the State of New York for the County of Suffolk.

On June 21, 2016, the Defendants, pursuant to 28. U.S.C. § 1441(a), removed the action to this Court, because the Plaintiff's Section 1983 claims invoke the Court's federal question jurisdiction, pursuant to 28 U.S.C. § 1331.

## II. DISCUSSION

### A. THE LEGAL STANDARD

Under FED. R. CIV. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When deciding a motion for summary judgment, "[t]he Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non–moving party.'" *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1998)).

"[A]t the summary judgment stage the judge's function is not [ ] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 173–74 (2d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L.Ed. 2d 202 (1986) (internal quotation marks omitted)). In other words, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from" the facts are jury functions, not those of a judge. *Barrows v. Seneca Foods Corp.*, 512 Fed.Appx. 115, 117 (2d Cir. 2013) (quoting *Redd*, 678 F.3d at 174 (internal quotation marks omitted)). The Court should not attempt to resolve issues of fact, but rather "assess whether there are any factual issues to be tried." *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 119 (2d Cir. 2012).

The movant has the burden of demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L.Ed. 2d 265 (1986). If a

nonmoving party fails to make a sufficient showing on an essential element of their case where they will have the burden of proof, then summary judgment is appropriate. *Id.* at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. *Liberty Lobby*, 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for that party. *See Dawson v. Cty. of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004).

**B. AS TO THE PLAINTIFF'S DUE PROCESS CLAIM.**

The Complaint alleges violations of the Plaintiff's constitutional right to due process, because the Defendants punished him without adequate notice or a hearing. The Defendants moved for summary judgment with regard to this claim on the grounds that: (1) the Plaintiff was not entitled to due process because he had no property or liberty interest in participating in the Variety Show; (2) any deprivation of a constitutionally protected interest was *de minimis*; and (3) the Plaintiff had sufficient notice and opportunity to be heard. In his opposition, the Plaintiff generally asserts that a disputed issue of fact exists regarding whether the Plaintiff violated the High School's Code of Conduct, as he believes no written rule, custom, or general understanding required him to seek permission to mention the Superintendent in his Skit. However, the Plaintiff makes no reference to case law construing the due process clause and does not respond to the Defendants' arguments in favor of summary judgment. Therefore, the Plaintiff effectively abandoned his due process claim, making summary judgment appropriate. *See Williams v. Suffolk Cty.*, 284 F. Supp. 3d 275, 284 (E.D.N.Y. 2018) (Spatt, J.) ("The Plaintiff did not respond, in any way, to the Defendants' arguments concerning his malicious prosecution claim. Therefore, that claim is deemed abandoned.") (collecting cases); *Sherman v. Cty. of Suffolk*, 71 F. Supp. 3d 332, 355

(E.D.N.Y. 2014) (Spatt, J.) ("[N]owhere in his papers does the Plaintiff articulate a substantive due process claim. To the extent the Plaintiff may have asserted such a claim in his amended complaint, he is deemed to have abandoned it on this motion.").

However, in this case, summary judgment would still be appropriate, even assuming the Plaintiff intended to continue the pursuit of his due process claim. It is undisputed that the only discipline imposed on the Plaintiff was prohibiting him from performing in the second night of the Variety Show. In other words, the Defendants barred the Plaintiff from participating in an extracurricular activity, something for which students have no constitutionally protected interests meriting due process protections. *See Gardner v. Wansart*, No. 05-cv-3351, 2006 WL 2742043, at *5 (S.D.N.Y. Sept. 26, 2006) ("[C]ourts in this circuit and elsewhere have held that due process need not accompany a public school's decision to remove a student from involvement in extracurricular activities."); *Mazevski v. Horseheads Cent. Sch. Dist.*, 950 F. Supp. 69, 72 (W.D.N.Y. 1997) ("[B]ecause the property interest that exists is in the entire educational process, there is no constitutional right to any one specific curricular or extracurricular activity, meriting due process protections."); *accord Toth ex rel. Toth v. Bd. of Educ., Queens Dist. 25*, No. 07-cv-3239, 2008 WL 4527833, at *5–6 (E.D.N.Y. Sept. 30, 2008) (dismissing a due process claim because students had no constitutionally protected interest in enrollment in Mandarin-English dual language program).

Accordingly, the Court grants the Defendants' motion for summary judgment dismissing the Plaintiff's due process claim.

### C. AS TO THE PLAINTIFF'S FIRST AMENDMENT RETALIATION CLAIM.

"The Second Circuit has described the elements of a First Amendment retaliation claim in several ways, depending on the factual context." *Odermatt v. Way*, 188 F.Supp.3d 198, 214

(E.D.N.Y. May 25, 2016) (quoting *Zherka v. Amicone*, 634 F.3d 642, 644 (2d Cir.2011)). Generally speaking, "a plaintiff must establish that: (1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011) (citations omitted). The Court finds that the Plaintiff failed to establish a genuine dispute over an issue of material fact with regard to any of these elements.

### 1. As to Whether the Plaintiff Engaged in Protected Speech.

As an initial matter, it is well-settled that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). Conversely, however, the rights of students "are not automatically coextensive with the rights of adults in other settings." *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 682, 106 S. Ct. 3159 (1986). Those rights must be applied "in light of the special characteristics of the school environment." *Tinker*, 393 U.S. at 506, 89 S. Ct. 733; *see also Fraser*, 478 U.S. at 682–83 ("The determination of what matter of speech in the classroom or in school assembly is inappropriate properly rests with the school board.").

Relevant here, "if the speech at issue is 'school-sponsored,' educators may censor student speech so long as the censorship is 'reasonably related to legitimate pedagogical concerns.'" *Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320, 325 (2d Cir. 2006) (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 261, 108 S. Ct. 562, 565 (1988)). Whether speech is deemed "school-sponsored" so that the *Hazelwood* standard applies relies on a determination of whether the speech "'might reasonably have been perceived to bear the imprimatur of the school.'" *Romano v.*

*Harrington*, 725 F.Supp. 687, 690 (E.D.N.Y.1989) (quoting *Hazelwood*, 484 U.S. at 271, 108 S.Ct. 562). This includes "activities [that] may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Hazelwood*, 484 U.S. at 271, 108 S.Ct. 562.

In the Court's view, the Bathroom Skit constituted school-sponsored speech, because the Plaintiff performed the Skit during the Variety Show. Although the Plaintiff's opposition brief contends that the speech at issue was purely the private speech of a student, the Plaintiff notably admits that the Variety Show is a school-sponsored event. ECF 25 ¶ 36. Consequently, the Plaintiff can only sustain his objection by establishing that the Bathroom Skit was somehow of such a private nature that it no longer bore the imprimatur of the school. The record does not support this conclusion, as Mangiamele, a faculty member, produced and directed the show and a general understanding existed that that the show's performances were approved by Mangiamele and the High School.

The Plaintiff argues that the Court should consider the performances at the Variety Show private speech because the event was an after-school extracurricular activity open to the entire community. However, the Plaintiff misconstrues the analysis used for determining *Hazelwood*'s applicability. The question is not whether the public *attended* the Variety Show, but rather whether they *spoke* at the Variety Show. *See Hazelwood*, 484 U.S. at 267, 108 S.Ct. 562 ("School facilities may be deemed to be public forums only if school authorities have by policy or practice opened those facilities for indiscriminate use by the general public or by some segment of the public.... If the facilities have instead been reserved for other intended purposes, communicative or otherwise, then no public forum has been created ....").

Here, the students performed in a school venue, and the High School curated, reviewed and approved the Acts and Skits. While the High School invited members of the public to view those performances, they did not perform at the Variety Show. The mere attendance of non-students, without more, does not change the underlying nature of the show, as it still occurred under circumstances controlled by the High School.

For this reason, the Court finds the Plaintiff's speech distinguishable from the speech at issue in the two cases he cites, *Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98 (D. Mass. 2003) and *E. High Gay/Straight All. v. Bd. of Educ. of Salt Lake City Sch. Dist.*, 81 F. Supp. 2d 1166, 1194 (D. Utah 1999). Both cases involved the regulation of student-initiated, student-led organizations whose activities were unrelated to the schools' curriculum or other, related activities, but who the defendants permitted to meet on school premises during non-instructional time. Essentially, these cases found that students, parents and members of the public were not likely to perceive the clubs as a school function, because the defendants did not promote or publish the clubs' speech simply by permitting them to meet on campus. The High School, on the other hand, directly involved itself in the production of the Variety Show and regulated its content by selecting the Acts and Skits. As a result, it could be more reasonably inferred by the public that the High School endorsed or sponsored the speech included in the performances.

Similarly, the Court disagrees with the Plaintiff's contention that his impromptu statement became private speech because it was not conveyed by the school itself and the school did not promote his individual performance. Speech at a school-sponsored event does not become private speech simply because it was uttered by a student. Under this interpretation, school-sponsored speech could not exist, because all speech by a student at a school-sponsored event would be considered private speech. The relevant issue is the forum and not the speaker. *See, e.g.*, *Santa Fe*

13

*Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 310, 120 S.Ct. 2266, 147 L.Ed.2d295 (2000) ("The delivery of [a] message—over the school's public address system, by a speaker representing the student body, under the supervision of school faculty, and pursuant to a school policy that explicitly and implicitly encourages public prayer—is not properly characterized as 'private' speech."); *DeFabio v. E. Hampton Union Free Sch. Dist.*, 658 F. Supp. 2d 461, 476–77 (E.D.N.Y. 2009) ("[T]he use of the school's public announcement system would also turn Daniel's private statement into school-sponsored speech.").

Therefore, the Court analyzes the Defendants' conduct under the *Hazelwood* standard, meaning that their actions comported with the First Amendment so long as they were reasonably related to legitimate pedagogical concerns. Requiring the approval of faculty members mentioned in Skits promotes civility and respect, two unquestionably legitimate pedagogical objectives. Indeed, the Plaintiff does not attempt to argue that the Defendants' conduct fails the *Hazelwood* test, and instead focuses solely on the more stringent standard applied to private speech. Accordingly, the Court finds that the Plaintiff's retaliation claim fails because he did not engage in protected speech.

### 2. As to Whether the Plaintiff Suffered an Adverse Action.

"First Amendment student speech cases ordinarily involve explicit censorship or avowedly disciplinary action by school administrators." *Cox*, 654 F.3d at 273 (collecting cases). Accordingly, there is "no clear definition of 'adverse action' in the school context." *Id.* Looking to guidance outside the school context, "an adverse action in a First Amendment retaliation case is conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Id.* "Under this objective standard, an adverse action must be more than de minimis to support a First Amendment retaliation claim." *Id.* Because this test is "highly

context-specific," it must be applied here "in light of the special characteristics of the school environment." *Id.* (citations omitted).

For the reasons discussed above, the Plaintiff, at most, suffered a *de minimis* deprivation. His claim does not arise from a suspension or other similar student discipline, but rather the barring of his performance in the second night of the Variety Show – a voluntary, extracurricular activity. As the Court previously explained, the participation in extracurricular activities is a privilege, not a right. Giving the Plaintiff every right, he remained free to criticize the Superintendent and the Bathroom Policy in any capacity that he liked. He did not, however, possess the absolute right to perform in the second night of the Variety Show, without any regard for the consequences of his previous statements. *See Doninger v. Niehoff*, 594 F. Supp. 2d 211, 215–16 (D. Conn. 2009) (dismissing a first amendment retaliation claim because the Plaintiff did "not have a First Amendment right to run for a voluntary extracurricular position as a student leader while engaging in uncivil and offensive communications regarding school administrators"); *Lowery v. Euverard*, 497 F.3d 584, 600 (6th Cir. 2007) (holding that dismissal of students from football team for campaigning to fire coach did not constitute an adverse action because students "regular education ha[d] not been impeded, and, significantly, they [were] free to continue their campaign to have [the coach] fired" but that the first amendment did not give them a right to "continue to play football for him while actively working to undermine his authority.").

Therefore, the Plaintiff failed to establish that he suffered a viable adverse action in connection with his speech.

### 3. As to Whether A Causal Connection Existed.

"Specific proof of improper motivation is required in order for plaintiff to survive summary judgment on a First Amendment retaliation claim." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d

Cir. 2001) (citing *Blue v. Koren*, 72 F.3d 1075, 1082–83 (2d Cir.1995)). Evidence of improper motive "may include expressions by the officials involved regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken." *Blue*, 72 F.3d at 1084.

Here, the undisputed record shows that the Plaintiff improvised lines in the Bathroom Skit, despite multiple warnings that he must adhere to the Script, and that the Defendants disciplined the Plaintiff for failure to abide by those warnings. The Plaintiff puts forth no evidence suggesting that the Defendants barred him from participating in the second night of the Variety Show for anything other than the fact that he violated the rules, and nothing else in the record otherwise illustrates an improper motive. As a result, in the Court's view, no rational jury could find an improper motive based on these facts. *See Belch v. Jefferson Cty.*, 108 F. Supp. 2d 143, 151 (N.D.N.Y. 2000) ("Because Plaintiff has not adduced facts from which a rational jury could conclude that Defendants disciplined him due to the content of his speech rather than his apparent violation of the Code, a rational jury could not conclude that Defendants acted with improper motivation."); *see also Cox*, 654 F.3d at 274; *Dole v. Huntington Union Free Sch. Dist.*, 699 F. App'x 85, 87 (2d Cir. 2017).

Accordingly, the Court grants the Defendants' motion for summary judgment and dismisses the Plaintiff's First Amendment retaliation claim.

**D. AS TO THE PLAINTIFF'S FREEDOM OF ASSOCIATION CLAIM.**

In the Complaint, the Plaintiff asserted a separate claim for violation of his right to freedom of association. The Plaintiff failed to oppose the Defendants' motion for summary judgment with regard to this claim, making it effectively abandoned and warranting summary judgment. *See Williams v. Suffolk Cty.*, 284 F. Supp. 3d at 284; *Sherman v. Cty. of Suffolk*, 71 F. Supp. 3d at 355.

Even assuming the Plaintiff intended to continue his pursuit of this claim, summary judgment would still be appropriate because it is duplicative of the meritless retaliation claim. *See Econ. Opportunity Comm'n of Nassau Cty., Inc. v. Cty. of Nassau*, 106 F. Supp. 2d 433, 439 (E.D.N.Y. 2000) (Spatt, J.) ("Expressive association claims, such as the Plaintiffs' claims that they have been retaliated against for their associations with minority groups and the poor, are considered to be the equivalent of free speech claims, since the expressive conduct alleged is inextricably linked to protected speech. Thus, to the extent that the Plaintiffs' freedom of association claims rely on these sorts of allegations, they must be dismissed as duplicative."); *Illiano v. Mineola Union Free Sch. Dist.*, 585 F. Supp. 2d 341, 355 (E.D.N.Y. 2008) (Spatt, J.) ("Here, the Plaintiff's freedom of association claim is duplicative of her inviable freedom of speech claim. Accordingly, the Defendants' motions to dismiss the Plaintiff's freedom of association claim under § 1983 are granted.").

Accordingly, the Court grants the Defendants' motion for summary judgment and dismisses the Plaintiff's freedom of association claim.

**E. AS TO THE PLAINTIFF'S VAGUENESS CHALLENGE.**

For the first time, the Plaintiff in his opposition asserts a claim that the Code of Conduct is unconstitutionally vague under the First Amendment. "Although a plaintiff need not cite to a particular statute or legal theory, [he] must not raise wholly new claims for [the] first time in submissions for summary judgment." *Klein v. Frenkel*, No. 14-cv-2719, 2015 WL 13721693, at *4–5 (E.D.N.Y. Feb. 19, 2015) (Spatt, J.); *see also Beckman v. U.S. Postal Serv.*, 79 F. Supp. 2d 394, 407–09 (S.D.N.Y. 2000) ("Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts . . . have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.") (collecting

cases). While the Court may in some circumstances be amenable to a motion for leave to further amend the Complaint to assert these newly-conceived claims, it is evident that the Plaintiff asserts this claim in an attempt to avoid the Defendants' meritorious summary judgment motion. Accordingly, the Court will not provide the Plaintiff with leave to amend the Complaint to correct this deficiency.

Bolstering this conclusion, the futility of the Plaintiff's vagueness claim is obvious. Not only did the Plaintiff suffer, at most, a *de minimis* deprivation, but the undisputed facts also show that he received multiple express warnings that he was prohibited from going off script and that he understood that he needed approval to reference a specific faculty member. The Plaintiff's belated assertion that no express provision in the Code of Conduct prohibited his behavior is insufficient to revive his otherwise fruitless lawsuit. The Code of Conduct enumerates a set of disfavored behavior, such as insubordinate or disruptive conduct, prohibiting non-compliance with the "reasonable directions" of teachers, school administrators or other school employees in charge of students. The High School determined that the Plaintiff's conduct failed to meet this standard and punished him accordingly. To the extent the Plaintiff takes issue with this terminology, the term "reasonable" is a ubiquitous standard in legal parlance capable of objective application by school administrators. *See Nichols Media Grp., LLC. v. Town of Babylon*, 365 F. Supp. 2d 295, 312 (E.D.N.Y. 2005) ("Where, as here, words have been given judicial standards by which to be judged, a vagueness challenge fails.").

Therefore, the Court grants the Defendants' motion for summary judgment and dismisses the Plaintiff's vagueness claim.

## III. CONCLUSION

For the foregoing reasons, the Court grants the Defendants' motion for summary judgment in its entirety and dismisses all of the Plaintiff's claims. The Clerk of the Court is directed to enter judgment for the Defendants and to close this case.

It is **SO ORDERED**:

Dated: Central Islip, New York

February 22, 2019

    /s/ Arthur D. Spatt

ARTHUR D. SPATT

United States District Judge